claims the recovering of gold, silver, &c., from waste solutions, by means of suitable precipitating ingredients, used in a proper apparatus, substantially as specified, or whether it claims a proper apparatus for recovering gold, silver, &c.. from waste solutions, by means of suitable precipitating ingredients, substantially as specified, it is equally open to objection. The specification states, that the object of the invention is to provide means for recovering from waste metallic solutions the valuable metal contained therein, after the solution has been used and spent. The result, that is, the recovering of such valuable metal, cannot be claimed. The means alone can be claimed. In the means. or the providing of the means, or the use of the means, to effect such result, the invention consists. Those means are stated by the specification to be, a vessel, to hold the waste solution, in which vessel chemicals may be placed, to precipitate the valuable metal and separate it from the waste. The specification states, that the vessel may be of any suitable material and of any suitable form and size; that in it may be suspended a bag containing any ingredient that will precipitate the metal, or such ingredient may be placed in the vessel in a loose state; that, after the precipitation takes place. the liquid may be drawn off through a suitable pipe arranged on any suitable part of the vessel. or it may be allowed to fill the vessel and run away over the top; that a filtering device may be used with the pipe, but can be dispensed with for the majority of solutions; and that the vessel may have a partition in it or may not. The sum and substance of all this is, that the result is the thing claimed to be patented. The apparatus is nothing but a vessel to hold the liquid, and the process consists only in putting into the liquid in the vessel the proper chemicals to effect the precipitation of the valuable metal. That a suitable vessel of a suitable form and size must be used to contain a liquid, if the liquid is to be utilized, is no new idea. To discover that a suitable precipitating ingredient will precipitate what it is capable of precipitating. is no invention. The claim is altogether vague and general. It is open to the objections stated in the case of O'Reilly v. Morse, 15 How. [56 U. S.] 62, 119, against the eighth claim of Morse's telegraph patent. It is, in effect, a claim to the use of the proper chemicals to precipitate the metal from the liquid waste solution, by putting such chemicals into any proper vessel containing the solution. The claim, in its present shape, cannot be sustained, and the bill must, therefore, be dismissed, with costs.

---

## Case No. 12,728.

### SHAWHAN v. WHERRITT.

[Cited in Beattie v. Gardner, Case No. 1,195. Nowhere reported; opinion not now accessible.]

SHAWK (LATTA v.). See Case No. 8,116.

SHAW–MUX (UNITED STATES v.). See Case No. 16,268.

SHAWNEE COUNTY BANK (WEST ST. LOUIS SAV. BANK v.). See Case No. 17,462.

---

## Case No. 12,729.

### In re SHEA et al.

[2 Biss. 156; 3 N. B. R. 187 (Quarto. 46); 2 Am. Law T. 107; 1 Chi. Leg News, 345; 16 Pittb. Leg. News, 85; 1 Leg. Gaz. 46.] [1]

District Court, D. Indiana. June 25, 1869.

BANKRUPTCY — SUSPENSION OF PAYMENT — PRESUMPTION.

1. The failure of a banker, merchant, or trader, who has suspended payment of his commercial paper, to resume within fourteen days, is prima facie evidence of fraud.

2. Unless such inference is affirmatively rebutted, he will, on a proper creditor's petition, be adjudged a bankrupt.

In bankruptcy. The petition herein was filed by J. H. Heinsheimer and others against Patrick Shea and William Boyle, June 7, 1869, charging that they, being partners, traders. etc., committed an act of bankruptcy, in this, "that within six months next preceding the date of this petition, the said Patrick Shea and William Boyle did commit an act of bankruptcy within the meaning of said act, in that they did, on the 28th of January, 1869, fraudulently suspend and stop the payment of their commercial paper, and did not resume the payment thereof within fourteen days thereafter, and have never paid the same." This "commercial paper," the petition alleges to be a note, dated at Cincinnati, January 27, 1869, for $926.55, payable one day after date. to the order of the petitioners, and executed to them by Shea & Boyle. The defendants filed an answer denying the allegations in the petition.

Reid & Carey, for petitioners.

Hendricks, Hord & Hendricks, for respondents.

McDONALD, District Judge. [On the trial it is agreed and admitted that if the note in question is "commercial paper" within the meaning of the bankrupt act, and if the mere fact that the defendants have failed to pay the same up to the time of the filing of the petition, is prima facie evidence of a fraudulent suspension of payment, within the meaning of the thirty-ninth section of the act, then the court shall find for the petitioners. This agreement confines our inquiries to two questions: First. is the note mentioned in the petition "commercial paper?" Second. when traders stop the payment of their commercial paper for fourteen days. and do not afterwards resume it, is this, prima facie, a fraudulent suspension of payment? We will examine these questions.

---

[1] [Reported by Josiah H. Bissell. Esq., and here reprinted by permission. 1 Leg. Gaz. 46, contains only a partial report.]

[First. Is the note in question commercial paper? It is payable on its face to the order of the payees. It is dated at Cincinnati; and, in the absence of any evidence to the contrary, I must, therefore, presume that it was executed in the state of Ohio. We need not cite authorities to show that, in such a case, the lex loci contractus governs the contract. Then, the note being executed in Ohio, it is to be construed by the law of Ohio. The law of Ohio puts notes like this on the same footing as inland bills of exchange. The note is, therefore, commercial paper, within the meaning of the bankrupt act.

[Second. When traders stop payment of their commercial paper for fourteen days, and do not afterwards resume it, is this prima facie evidence of a fraudulent suspension of payment?] [2]

The language of the bankrupt act is, that every person, "who, being a banker, merchant or trader, has fraudulently stopped or suspended, and not resumed payment of his commercial paper within a period of fourteen days, shall be deemed to have committed an act of bankruptcy." This question has been much discussed in many of the district courts of the United States; learned judges have given various and different answers to it; and it still remains unsettled. Three views appear to have been taken of it: first, that the mere failure to pay, or to resume payment, is conclusive evidence of fraud; second, that it is only prima facie evidence of fraud; third, that it is no evidence at all of fraud. Without entering upon a discussion of the reasons upon which different judges have come to these opposite conclusions, I conclude that the failure to pay and to resume payment is prima facie evidence of fraud, and no more. I thus decide, for the following reasons:

1. To hold that such failure to pay and to resume payment is conclusive evidence of fraud, and consequently of an act of bankruptcy, would sometimes be followed by unjust and absurd consequences. If we adopt this rule, then we might force into bankruptcy the wealthiest and most prosperous trader in the country. Suppose a trader to be worth $100,000, and to owe $1,000 on commercial paper. At the time when this paper falls due, some accident befalls him—he is prostrated by sickness—all the money he has on hand is stolen or depreciates greatly in value —or suppose that he is necessarily abroad, and cannot reach home within the fourteen days, and by a mere forgetfulness, did not, before leaving home, provide for paying such commercial paper—in these and many other cases that might be supposed, the creditors would be entitled to file their petition against him in bankruptcy on the next day after the expiration of the fourteen days. But in such cases it would be harsh and absurd to hold that his mere failure to pay before the peti-

[2] [From 3 N. B. R. 187.]

tion was filed, is conclusive of a fraudulent intent on his part, and to preclude him from offering evidence exculpating him from such intent, and evincing his ability and willingness to pay.

2. It is a point of pride, as well as of duty, that traders shall not suffer their commercial paper to be dishonored. Every one knows that such dishonor seriously affects his commercial reputation and business. It is reasonable, therefore, to presume, when he fails promptly to honor his commercial paper, either that he does so fraudulently, or is insolvent. For if he can pay, and does not, that is, among traders, a fraud within the meaning of the bankrupt law; and if he is insolvent and cannot pay, but still carries on his trade, this, I think, is, in view of that law, a fraud—at least, he can, in that case, have no reason to complain if his creditors attempt to have him adjudged a bankrupt. I think, therefore, that a banker, merchant or trader who stops the payment of his commercial paper for fourteen days, and does not afterwards resume it before he is proceeded against as a bankrupt, is not to be deemed prima facie innocent of all fraud.

3. Such a failure to pay on the part of a banker, merchant or trader ought to be so far deemed evidence of fraud as to cast on him the necessity of explaining his conduct, because of the great difficulty in such a case of proving actual fraud. It is generally true, indeed, that, when the question is fraud or no fraud, he who alleges fraud must prove it. But in cases like the present it is almost impossible by direct evidence to prove actual fraud. However great the fraud might be, all that we could reasonably expect the petitioner to be able to prove, would be the failure of the debtor to pay the commercial paper. The intent which led to the failure, it would generally be impossible to prove by anything like direct evidence. But on proof of the failure, I think, the fraudulent intent may be fairly inferred till the contrary is proved. On the other hand, if facts exist which may fairly rebut the inference of fraud, they would in most cases be easily proved. For example, the facts we may suppose to be, as above stated, severe and protracted sickness or unavoidable and unexpected absence from home, and the like. In such cases, the debtor could generally prove the facts, and thus rebut the prima facie case made by proof of the mere omission to pay. This rule making the mere failure to pay prima facie evidence only of a fraud, therefore, commends itself to us on account of its fairness, its plainness, and its easy and general application to cases of this kind. Moreover, it appears to me to be quite consistent with the general scope of the bankrupt act, and to do no violence to the 39th section, on which this question arises. Avoiding extremes, therefore, and following the maxim in medio tutissimus ibis, I conclude that the failure on the part of a banker, merchant or

trader to pay his commercial paper for fourteen days after it falls due, unless payment is resumed before proceedings in bankruptcy are commenced against him, is prima facie evidence, and only prima facie evidence, that he has committed an act of bankruptcy.

NOTE. To the same effect are the following: In re Jersey City Window Glass Co. [Case No. 7,292]; In re Ballard [Id. 816]; In re Lowenstein [Id. 8,574]; Doan v. Compton [Id. 3,940]; Davis v. Armstrong [Id. 3,624]; In re Hollis [Id. 6,-621]. That fraud must be proved. In re Leeds [Id. 8,205]; In re Cone [Id. 3,095]; In re Davis [Id. 3,615]. Since the amendment making the clause read "fraudulently stopped payment, or who has stopped or suspended and not resumed payment of his commercial paper within a period of fourteen days," it is held that the "fourteen days" applies to the suspension only, and that the word "fraudulently" only relates to the first portion of the clause. In re Wells [Id. 17,387]; In re Cowles [Id. 3,297]; In re Sohoo [Id. 13,162]; In re Thompson [Id. 13,-936]; In re Hall [Id. 5,920]; In re Burt [Id. 2,210]; Baldwin v. Wilder [Id. 806].

SHEA (HEINSHEIMER v.). See Case No. 12,729.

SHEA (UNITED STATES v.). See Case No. 16,269.

## Case No. 12,729a.

SHEAFE et al. v. KIMBALL et al.

[18 Betts. D. C. MS. 84.]

District Court, S. D. New York. March 24, 1851.

INFANCY — CONTRACTS — PARTNERSHIP — CHARTER-PARTY—BREACH –ACCEPTANCE OF NOTES —AMOUNT OF RECOVERY.

[1. A minor partner is not liable on partnership contracts.]

[2. The acceptance of notes as a liquidation of a claim for breach of charter-party, but not in satisfaction thereof. does not bar the admiralty jurisdiction, if the notes are surrendered into court for cancellation but the amount of the recovery is fixed by the notes.]

[This was a libel by Samuel Sheafe and Horatio Coffin against Edward W. Kimball, Michael P. O'Hearn and Thomas Dunkin, for breach of charter party.]

BETTS, District Judge. The libel charges that the co-partnership of E. W. Kimball, consisting of Edward W. Kimball, Michael P. O'Hearn and Thomas Dunkin, at New York on the 17th day of May, 1849, by their agent John F. Schwander. chartered of the libellants the ship Alhambra, for a voyage from New York to Liverpool and back to New York. and for the charter or freight on the voyage out and back engaged to pay the libellants $1800 and pay all incidental expenses. &c.. and to furnish the ship with cargoes of lawful merchandise or passengers on both

voyages. The libellants aver a full performance on their part of the terms of the charter-party and they charge that the respondents refused to fulfill it on their part in not supplying the cargoes in New York agreed to be furnished, and when the ship arrived at Liverpool refusing to receive the consignment of her as stipulated, pay her expenses, a portion of the freight, &c., and to load and dispatch her to New York. and claim damages to the amount of $3854. satisfaction of which sum with interest from October, 1849, is demanded. The warrant of arrest was served on O'Hearn and Dunkin. Kimball was returned not found, and a supplemental libel was filed praying process of foreign attachment. It was issued and certain effects attached to compel his appearance, but he did not appear or offer any defence. The other respondents answer separately and by different proctors.

O'Hearn admits the charter of the vessel by the firm by Schwander, but does not know that it was in behalf of the libellants. He is ignorant of the transactions in Liverpool, but alleges the master of the ship by due diligence might have procured a charter there which would have protected the respondents from loss. He admits that on the return of the ship the libellants claimed damages to $3854. and that the matter being in dispute an adjustment was finally made by the respondents giving their two promissory notes dated October 25, 1849, and for $1850 payable in thirty days and one for $1000 payable in 60 days, which notes the libellants still hold and have never restored to respondents or offered so to do; and insists the maritime character of the contract was thereby merged, and the libellants have no right to resort to the original consideration of the notes. nor recover beyond their amount; and denies the jurisdiction of the court.

Dunkin in his answer denies that the firm of the respondent were engaged in chartering vessels for Liverpool, and that. although he is informed and believes one of the firm executed the charter party articled upon, he had no authority to bind the copartnership thereby and the respondent had expressly refused to give authority or be concerned therein. As to the matters of detail he is ignorant, except that he admits the friends of the firm to whom the ship was consigned in England refused to accept the consignment, or take any charge or responsibility on account of the ship, and so notified her master. That the said copartnership was dissolved on the 23d August, 1849, by the respondent retiring therefrom, of which the libellants had notice, and that subsequent thereto the libellants through their agent Schwander settled their demand against the firm of E. W. Kimball & Co. by taking notes in the name of the new firm (continued by other parties) which notes the libellants have still in their possession. That at the settle-